Stewart Management Company, Formerly Stewart Motor Company v. Commissioner.
Stewart Management Co. v. Commissioner
Docket No. 503-65.
United States Tax Court
T.C. Memo 1969-37; 1969 Tax Ct. Memo LEXIS 259; 28 T.C.M. (CCH) 187; T.C.M. (RIA) 69037; February 24, 1969. Filed James Powers, 807 Security Bldg., 234 No. Central Ave., Phoenix, Ariz., for the petitioner. Eugene H. Ciranni, for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined deficiencies in income tax against petitioner and additions thereto under sections 6651 and 6653(a) of the Internal Revenue Code of 1954 as follows: *11
Additions to Tax
Year
Deficiency
Sec. 6651
Sec. 6653(a)
1957
$29,017.59
$ 1,450.88
$1,450.88
1958
21,329.03
1959 37,623.12
9,405.78
1,881.16
Total
$87,969.74
$10,856.66
$3,332.04
*260 188 Issues for determination are: (1) Whether petitioner is entitled to a bad debt deduction in the aggregate amount of $35,251.08, consisting of three items, or any part thereof for 1957, and (2) whether $76,382.35, shown in petitioner's Accounts Receivable general ledger account in dollars only and without any identification of individual accounts either in name or amount, charged against its net earnings account under date of June 30, 1962, was in the aggregate debts which became worthless in 1957 and therefore deductible for that year or, in the alternative, if not bad debts, deductible for 1957, as accounts abandoned in that year, or further, in the alternative, were debts in that aggregate amount which became worthless on dates not established during the years 1950 to 1959 and deductible in allocated amounts for those years. Findings of Fact Some of the facts and some evidence have been stipulated and the facts stipulated are so found. Petitioner was incorporated as Stewart Motor Company on January 15, 1947. Its place of business was 1800 North Central Avenue, Phoenix, Arizona. It was organized for the purpose of taking over the operation of a Studebaker distributorship *261 which previously had been conducted by a partnership of two brothers, Jack P. and Spencer D. Stewart. From March 17, 1947, through 1959, 75 percent of the outstanding stock was owned by Jack and 25 by Spencer. As shown by petitioner's income tax return for 1956, petitioner at December 31, 1956, had an accumulated net operating loss in the amount of $130,447.12. On July 7, 1958, petitioner filed a 1957 income tax return with the district director of internal revenue, Phoenix, Arizona. Petitioner filed a timely income tax return for 1958 with the district director of internal revenue, Phoenix, Arizona. On January 9, 1961, petitioner filed a delinquent 1959 income tax return with the district director of internal revenue, Phoenix, Arizona, and on November 15, 1961, filed an amended 1959 income tax return. On May 24, 1956, the petitioner filed a 1955 income tax return with the district director of internal revenue for Arizona and on June 17, 1957, similarly filed a 1956 income tax return. On its return for 1957 petitioner reported a net loss of $2,685.98. In his determination of deficiency the respondent, through the disallowance of deductions and additions to income, determined *262 taxable net income of $66,379.99. Of that amount, $35,251.08 resulted from the disallowance of three items in that aggregate amount which had been claimed as bad debt deductions. On its income tax return for 1958 petitioner reported net income of $34,438.73, but through the application of a claimed net loss carryover in that same amount reported no taxable net income. In his determination of deficiency respondent disallowed the claimed net loss carryover of $34,438.73 and made other disallowances and additions to income in arriving at $57,721.64 as petitioner's taxable net income for 1958. On its income tax return for 1959 petitioner reported net income of $65,593.50 and claiming a net loss carryover in the same amount reported no taxable net income. On its amended 1959 return it reported net icome of $58,610.42 before claiming a net loss carryover to show no taxable net income. The respondent in his determination of deficiency disallowed the claimed net operating loss carryover and made other disallowances, additions to income, and one exclusion from income, determining correct net taxable income as $82,929.07. In March of 1954 petitioner moved its Studebaker dealership to a *263 new location at 1014 North Central Avenue and rented its buildings and other facilities at 800 North Central Avenue to Stephens Motors, Inc., another corporation owned by the Stewarts, which thereafter used the premises and facilities at that address as its principal place of business. Petitioner continued to maintain its principal books of account in the building at 800 North Central. On or about April 30, 1955, petitioner's Studebaker franchise was terminated and it ceased operation as an automobile dealer. For the remainder of 1955 but through the taxable years herein, at least, it continued to earn substantial amounts of gross income from various other activities. It is stipulated that in 1957, 1958 and 1959 petitioner derived net income in the respective amounts of $5,939.55, $3,982.41 and $11,943.09 "from assets previously owned by Stewart Motor Company." On its 1958 return petitioner stated as its principal business activity "New & Used 189 Car Sales Equipment Rental." For a comparatively short period it carried on a profitable operation as a Rolls Royce dealer. According to Spencer Stewart, 1959 may well have been the peak period of that operation. On or about April 30, 1955, when *264 petitioner terminated its operation as a Studebaker dealer it sold various items from its fixed assets. According to its 1955 income tax return the items sold consisted of a frame and stucco building, service and tow cars, body shop equipment, furniture and fixtures, electrical heaters, machinery and equipment including welding gauges, leasehold improvements at 1014 North Central, a 1949 Jeep, and a neon sign. As shown by the return the adjusted basis for the items sold amounted in the aggregate to $10,135.47. The selling price was $24,556.57 and the reported profit $14,421.10. Petitioner employed a method of accounting denominated the "Reynolds System" which was a system of accounting suitable for the use of new car dealers. The forms employed by petitioner were specifically designed for the use of a Studebaker dealer. Under this system it was intended that accounts receivable arising from sales of cars or from the sale of parts or from repair work would be totaled daily and those daily totals would be posted in an appropriate journal. The totals in these journals were to be summarized monthly and the monthly totals then posted in the general ledger, so that the general ledger balance *265 would represent the accumulated dollar total of those transactions. Each check issued was to be entered in the cash disbursements journal and each car sale in the sales journal but the cash receipts journal would show only the total cash received on a particular day and there was no identification of the individual customers' accounts to be credited. A ledger card was to be maintained for each individual customer which would show the detail of the transaction taking place with respect to the account, to the end that the card would reflect the current status of the account at any indicated time. Neither the names of the customers nor the details of the individual accounts were entered in the journal nor were they carried into the general ledger. The individual ledger cards were the only records which were supposed to show the details of the individual customer's account. Frank Greene was the secretary and treasurer and a director of Stewart Motor Company, thename later being changed to Stewart Management Company. He was petitioner's full-time accountant and supervised the maintenance of its books and records as well as the books and records of all other enterprises of the Stewart *266 brothers. He prepared the income tax returns of petitioner and decided which accounts receivable should be claimed as bad debts. The income tax matters of petitioner were primarily his responsibility. Greene was related to the Stewart brothers by marriage. He was married to the daughter of their father's half sister. At the time he was employed by petitioner he was working for a finance company in Wichita, Kansas, and was their head auditor and bookkeeper. He wanted to come to Arizona and, petitioner needing "a bookman", the Stewarts asked him to come to Arizona where he was employed by petitioner in the capacities above-mentioned. He had served the petitioner in those capacities for a number of years prior to the taxable years herein. Lynn Makemson, an attorney, was employed by petitioner from some time in 1951 until about 1960. Primarily, his duties were collection or attempted collection of petitioner's delinquent accounts. At times he also acted as defense counsel in suits against petitioner by, among others, dissatisfied car purchasers. Makemson had an office at the petitioner's place of business and his performance of duties for it occupied most, if not all, of his working *267 time. He did at times, whether or not during his regular working hours with petitioner, serve in a legal capacity for other parties. With respect to petitioner's accounts receivable, the individual account card of a customer would be handed to Makemson by the bookkeper if the account was six months past due. He wrote collection letters to such customers and if his efforts at collection were not effective the account would be turned over to one of the various collection agencies with which petitioner did business. If in turn these efforts were not effective and Makemson concluded that an account was not collectible, he would give the ledger card to Greene, advising that in his opinion the account was not collectible and should be "entered" as a bad debt. Aside from the above, Makemson had nothing to do with the making up of the list of debts to be claimed as bad debt deductions on the petitioner's returns. When 190 the tax returns were prepared Greene or his assistant, Meyers, [1] would at times, not always, given Makemson a list of the accounts deducted as bad debts for him "to look at" to see if he could recognize any accounts which should not be charged off. [2]
*268 Of the $35,251.08 of bad debt deductions disallowed for 1957, $9,563.11 and $16,000 were listed on the return as notes, the $9,563.11 as owing by Richard Seber and the $16,000 by Midway Motors. The remaining $9,687.97 was shown as accounts receivable in that aggregate amount and consisted of 61 individually named accounts ranging in amounts from 45" to $2,177.74. Revenue agent Clyde Diller was assigned to examine petitioner's books and records with respect to its returns for the years 1957, 1958 and 1959. He began his examination on or about January 12, 1961. At petitioner's offices he was referred to Frank Greene. One of his inquiries of Greene was for the production of the account records covering the accounts for which bad debt deductions had been claimed on the 1957 return. Some of the pertinent ledger cards were produced. He had started his examination of them when he came across cards covering accounts which had been deducted in full but which carried entries showing that some of the accounts had been paid in full as early as 1955 and some showing that partial payments had been made. He asked Greene for an explanation. Greene's response was "I don't know," saying, however, *269 he would look into it. Some of the accounts cards asked for were missing, or, at least, were not produced. Greene agreed to have the cards available upon Diller's next visit. When Diller returned to continue his examination all of the ledger cards were missing and in the meantime Greene had left the company. He was not fired by the Stewarts but left of his own volition. It was their understanding that he had gone to the Missouri or Arkansas Ozarks. [3]
*270 Richard Seber is a nephew of Jack and Spencer Stewart and during the period here pertinent was operating a towing and wrecker service. He was one of the purchasers of various items of the fixed assets of petitioner when it terminated its operations as a Studebaker dealer on or about April 30, 1955. The items purchased by Seber included a wrecker truck, a pickup truck, floor jacks, workman's chest, two old office desks, a beverage machine, a grinder and polisher, a spray gun, an air compressor, a paint booth and some other miscellaneous items. [4]
It was Seber's understanding that he was to pay for the equipment by doing work from time to time for petitioner, such as towing. When for instance *271 he towed cars to petitioner's body shop he submitted a bill showing the cost of the service rendered with the understanding that the amount shown on the bill was to be applied in satisfaction of his obligation in acquiring the above items from petitioner. On some undisclosed date Seber was informed by Frank Greene that he owed petitioner "$9,000 to $10,000". He took the position that he never owed that much money in the first place. [5]
*272 190 At December 31, 1955, petitioner's general ledger carried a Richard Seber account reflecting an indebtedness of $9,563.11 to petitioner. The account did not exist at the beginning of the year. It continued unchanged through 1956. At December 31, 1957, the account showed no amount owing by Seber. Under Notes, Richard Seber, $9,563.11 was deducted as a bad debt by petitioner on its 1957 return. Midway Motors was a corporation organized by Jack and Spencer Stewart to operate the Studebaker dealership midway between the cities of Phoenix and Glenview, both in Arizona. The stock was owned by the Stewarts in the same proportions as the stock of petitioner. Petitioner sold parts and automobiles to Midway. The operation of Midway Motors was financially unsuccessful and it went out of business in 1954. Most of the assets were sold at that time and the remaining assets were acquired by petitioner. On its income tax return for 1957 petitioner claimed a bad debt deduction of $16,000, which was listed in that amount in the schedule of "Bad Debts Charged Off" as a note. Petitioner used the specific item method of claiming bad debt deductions throughout its entire history. By a *273 journal entry dated June 30, 1962, Munson, who had succeeded to Greene's position with the petitioner on April 1, 1961, credited petitioner's Accounts Receivable ledger account in the amount of $76,382.35 and by debit entry of the same date charged that amount to petitioner's Retained Earnings account, with the explanation "To write off old Stewart Motor Co. accounts." There was no identification of any of the individual accounts making up the $76,382.35 by names, dates or amounts, [6] or of any of the debits or credits which may have been made to any such account. Opinion Under section 166(a) of the Internal Revenue Code of 1954 "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." According to section 1.166-1(c) of the Income Tax Regulations *274 "Only a bona fide debt qualifies for the purposes of section 166," and "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." It is thus apparent that the questions as to the deductibility of the claimed bad debt deductions are primarily, at least, questions of fact. The facts shown as to each and all bad debt items are very limited and petitioner admitting as much has sought to substitute conclusions based on surmise, conjecture and argument for pertinent facts not proven. On each and all of the items in issue as bad debts it is patent we think that Frank Greene was the one individual who was in position to supply, to a very substantial extent, the information which is missing. As late at least as January 12, 1961, customer ledger cards were to be had. By April 1, 1961, they were gone. Greene had had charge of petitioner's bookkeeping and that of the other Stewart enterprises. He had prepared its income tax returns and had made the final decisions as to the accounts to be deducted as bad debts, although he previously had recommendations from Makemson that certain debts *275 should be claimed as bad debts. There is no indication that in the conduct of these activities Greene was under the supervision of anyone. An explanation of Greene's failure to appear and testify appeared to be that his exact whereabouts were unknown and at one point petitioner's counsel observed that it was unlikely that Greene could supply any helpful information if he should appear. As to the vulnerability of that observation the record, we think, speaks eloquently and convincingly. It could of course be that Greene would be an unwilling witness but it was the testimony of Spencer Stewart that Greene was not fired from his employment by petitioner and further that he found it difficult to believe that Greene was guilty of any wrongdoing. But be that as it may, apparently no effort was made to call him as a witness at the time of the trial herein or otherwise procure his testimony. With respect to the Seber indebtedness it was Seber's testimony that on some date 192 not stated he was informed by Frank Greene that he owed petitioner "$9,000 to $10,000" for the equipment he had purchased from petitioner when it ceased operations as a Studebaker dealer. He did not remember the *276 exact amount he was to pay but "it was around $6,000", the payment of which was to be made by the performance of towing services for petitioner. He further testified that he "got hold of Jack and Spencer and Frank and * * * it was admitted" that he did not owe that much money. Spencer Stewart in his testimony agreed that the amount demanded of Seber by Greene was too great and Seber would not have to pay that much. There is no testimony as to the records, if any, which were on hand at the conference in which the Stewart brothers, Seber and Greene participated. We are advised of course that all ledger account cards that may have been extant disappeared but that did not occur until sometime between January 12, 1961, and April 1 of that year. In this instance, however, the Seber item of $9,563.11 was reflected in a separate Richard Seber account in the general ledger from some undisclosed date in 1955 through 1956 to some date in 1957. The purchase of various items of equipment by Seber from petitioner had occurred in 1955, "about the middle of the year", and it was as of December 31, 1957, that petitioner deducted the $9,563.11 on its 1957 return under "Notes" as a bad debt owing by *277 Seber. In claiming deduction of bad debts the Seber items, along with those of Phoenix Studebaker, Inc. and Midway, were shown by petitioner on its bad debt schedule under "Notes" while all other items were listed under "Accounts". There is no showing whether Seber did or did not sign a note at the time of purchase and, if so, the amount thereof. In any event no note, whether paid or not, has been produced. There is no showing as to the date of Seber's conference with the Stewart brothers and Greene, or of the exact amount it was agreed Seber should pay, or whether it was before or after the $9,563.11 shown in the Richard Seber general ledger account was deducted as a bad debt on petitioner's 1957 return. Similarly, there is no showing of the aggregate of the charges for towing actually done by Seber for petitioner in payment of the indebtedness he incurred in purchasing the equipment or how much, if any, had been done at the time of the conference. We do of course have his testimony that according to his recollection the amount was fully paid by some time in 1958 through towing services he had performed for petitioner. There is no evidence as to whether the reduction of the amount *278 originally charged to his account or the charges by Seber for towing services which were to be applied in payment of his indebtedness were ever actually entered in petitioner's books of account. Such being the state of the record it is our conclusion that the facts shown do not sustain the petitioner's claim of deduction, and for failure of petitioner to carry its burden of proof we hold for the respondent. We reach the same conclusion as to the deduction, also on the 1957 return, of the Midway Motors item of $16,000. Midway Motors was a corporation organized by the Stewart brothers to operate a Studebaker dealership. Its stock was owned by them in the same proportions as the stock of petitioner. Petitioner sold automobiles and parts to it. The operation of Midway was not financially successful and it went out of business in 1954 following which most of the assets were sold and the assets remaining of whatever value were acquired by petitioner. If petitioner ever maintained a ledger card covering its sales to Midway, it was not produced. If such a card was maintained, presumably it disappeared with the other ledger cards as set forth in our facts above. Similarly the note, if *279 any there was, likewise was not produced. Petitioner on brief states that there was no Midway Motors account in petitioner's general ledger as there was in the case of Seber. There is no proof as to just what the $16,000 deducted under "Notes" as a bad debt actually covered, nor is there any direct proof as to just where and how it was carried of record. It could be, however, as petitioner's counsel claims, that it was carred in the Accounts Receivable account, since it does appear from Exhibit 30, dealt with hereafter, that there was a credit, described as "General Journal", of $25,687.97 to the Accounts Receivable account in 1957, and the difference between that amount and the 61 accounts amounting in the aggregate to $9,687.97 also claimed as bad debt deductions on the 1957 return is $16,000. Presumably facts pertinent to this issue might have been had from Midway's books 193 and records. It was Jack Stewart's thought, expressed in his testimony, that they were in the vault at petitioner's headquarters at 800 North Central Avenue in Phoenix, but neither they nor proper transcripts therefrom were offered in evidence or produced in Court. For failure of proof by petitioner, *280 the respondent's disallowance of the deduction claimed is sustained. We also hold for the respondent in his disallowance of the claimed bad debt deductions amounting in the aggregate to $9,687.97 and covering 61 items as shown on its 1957 return. Petitioner offered no evidence to show that the debts did become worthless in 1957 or as a matter of fact that they became worthless in any year. On the other hand, there was evidence to the effect that at least some of the items had been paid in full as far back as 1955 and others had been paid in part. The final issue is as to the deductibility of $76,382.35 eliminated from petitioner's Accounts Receivable general ledger account by entries dated June 30, 1962, crediting Accounts Receivable in that amount and debiting that same amount to its Retained Earnings account. No claim of deduction of the $76,382.35 has been made at any time on any of petitioner's income tax returns; but the question of deductibility is now raised by petitioner in its pleadings herein. As shown in its amended petition it is the position of the petitioner that the accounts constituting in the aggregate the $76,382.35 charged to the Retained Earnings account *281 on June 30, 1962, became worthless in 1957 and are therefore deductible for that year. In the alternative it contends, first, that if not deductible as bad debts for 1957 the amount is deductible as a loss for accounts abandoned in that year; and second, if not a deductible loss in 1957 by reason of abandonment or as debts which became worthless in that year, then, as debts which became worthless in various of the years 1950 through 1959, inclusive, the said amount should be allocated to years within the 1950 to 1959 period and allowed as bad debt deductions for the years to which allocated and to the extent allowed as deductions for any year or years prior to 1957 added to the $130,447.12 shown by the 1956 return as the amount of its accumulated operating net loss at December 31, 1956. [7]
In his supplemental brief petitioner's counsel appears to adopt the second alternative contention above as his *282 primary contention and suggests his idea of an acceptable formula for spreading the deduction of the amounts over the period 1950 through 1959, while admitting that neither the actual year when any one of the accounts became worthless nor the amount thereof have been shown. As establishing that petitioner did have on its books unpaid accounts receivable amounting in the aggregate to $76,382.35 as of December 31, 1959, and that all were worthless no later than that date petitioner placed in evidence its Exhibit 30. Exhibit 30 was prepared by a certified public accountant employed by petitioner, preliminary to the trial herein, to trace the said $76,382.35 to its origin or origins in petitioner's books of account. Starting with petitioner's income tax returns for the various years and by the use of work papers, appearing to the accountant to have been used in the preparation of the various returns, he succeeded in tracing the amounts shown in the aggregate as accounts receivable, as per the balance sheets carried in the tax returns, back to various amounts reflected, in dollars only, in the Accounts Receivable accounts in the general ledger, and other separately named and carried *283 accounts receivable accounts, the grand totals of which as shown on Exhibit 30 corresponded to the amount carried as Accounts Receivable in the balance sheets of the income tax returns. The worksheets so used were not offered in evidence and there was no showing as to the identity of the preparer of them. It was the testimony of the accountant, however, that he could ultimately have traced the amounts shown as Accounts Receivable in the balance sheets in the various returns to amounts appearing as Accounts Receivable in petitioner's general ledger which in the aggregate corresponded to the amount of Accounts Receivable as per the income tax returns without the use of the work papers which in the end merely served to save time. The first eight pages of Exhibit 30 purport to show the totals of both the debits 194 and credits and the derived balances, all as of the end of the year, in its general ledger Accounts Receivable account and its Deferred Accounts Receivable for each year as far back as 1947 and through 1959. The Deferred Accounts Receivable, originally denominated Deferred Accounts Receivable Collection Agency Account, was not set up until some date in 1952, its opening *284 entry being a debit of $5,631.71 explained as "transfer from accounts receivable." Exhibit 30 also contains three additional sheets purporting to show the year end balances, also back to January 1, 1947, of a number of other separately named accounts receivable accounts as well as those of the two accounts above and a grand total of all such balances as of the end of each year. The schedules in Exhibit 30 tracing the balances shown from year to year in the Accounts Receivable ledger account indicate that the last of the debit or credit entries in that account was a credit in the amount of $3,734.95, described as cash receipts, on some undisclosed date or dates in 1958 and that the debit balance in the account at both December 31, 1958, and December 31, 1959, was $64,095.24. In the case of the Deferred Accounts Receivable, opened as stated in 1952 with a debit entry of $5,631.71 from the Accounts Receivable, Exhibit 30 indicates both debits and credits under the description "General journal - transfer from accounts receivable" in 1953 and 1954. Other credits for those years are shown as "cash receipts" For 1955 a credit entry of $35 was described as "1955 transactions, cash receipts". *285 After December 31, 1955, no debits or credits were indicated, and the balance at December 31, 1955, and at December 31 for the succeeding years through 1959 was shown as $12,287.11. The $12,287.11 balance as shown for Deferred Accounts Receivable, together with the $64,095.24 from the Accounts Receivable account comprise the total of $76,382.35 for which the deduction or deductions are claimed. It was the testimony of the accountant that in preparing Exhibit 30 he was able to find for each year debits and credits to Accounts Receivable and Deferred Accounts Receivable in the general ledger, the aggregate of which for the respective years represented the year end totals shown in Exhibit 30. It was his further testimony that except for a debit entry of $16,565.61 for 1947 and two credit entries of $19.75 and $11,653.75 for 1947 and 1952, respectively, and for which no source was shown or indicated, all other debit and credit entries indicated that the sources from which they were posted were journals, as variously described by him in Exhibit 30, namely Cash Receipts, Cash Disbursements, Used Car and New Car Sales journals, Purchase Journal, General Journal, Repairs, Payroll and Company *286 Work. He also testified that these journals were not source records or records of original entry; but carried only the dollar amounts which were indicated as having been posted to them from the source records or records of original entry, none of which were available to him As for entries in the ledger accounts indicated as having been posted from a Company Work journal it was his testimony that he never saw or examined such a journal. He did testify generally, however, that where the entry in the journal ledger account indicated the journal from which it was posted he did trace the entry back to the indicated journal. From the accountant's testimony he has, in our opinion, traced the $76,382.35 for which deduction is claimed to the two figures appearing above as the December 31, 1959, balances in the two accounts receivable ledger accounts, the total of which is $76,382.35. It is the contention of the petitioner that the balances so shown at December 31, 1959, on the accounts receivable ledger sheets establish existing debts in the aggregate amount claimed and that absence of entries in the Accounts Receivable account after 1958 and in the Deferred Accounts Receivable after *287 1955 establishes the worthlessness of any and all debts represented by the $76,382.35 and that, regardless of the complete absence of facts covering the individual accounts or tracing the $76,382.35, or any part thereof, back to the individual accounts, or to any of them, and the absence of evidence as to the year in which any of the debts became worthless, if in fact any of them did become worthless. Aside, however, from any question of law as to whether an aggregate of debts established only in the dollar total thereof and without any proof relating the debts to individual customers either in names or amounts, the dates of origin or the year in which any debt became worthless, would or would not be deductible on a lump sum or allocated basis over a period of years, 195 by the end of which it is established that they were without value, the petitioner, in our opinion, has not proven the facts on which the allowance of the deductions here claimed may be based. As stated at the outset, section 166(a) of the Code and section 1.166-1(c) of the Regulations provide that a debt to be deductible must be a bona fide debt, being a debt "which arises from a debtor-creditor relationship *288 based upon a valid and enforceable obligation to pay a determinable sum of money" and must have become worthless "within the taxable year" for which the deduction is claimed. Further it was stipulated by the parties in the course of the trial that petitioner in claiming bad debt deductions has consistently used the specific item method throughout its history. It is accordingly apparent that simply stated the proof here is that the two ledger accounts do show balances which, according to the style of the accounts, reflect existing unpaid debts amounting in the aggregate to the $76,382.35 here clamed. But there is no proof as to individual debts themselves either as to the individuals, firms or concerns supposed to be the obligors, the individual amounts for which they are supposed to be obligated, the dates the purported debts arose, or just what was involved in the particular transaction giving rise to any of the specific debts which together may be said to comprise the dollar balances in the two accounts. It is admitted that there is no proof of the year in which any debt became worthless and on the evidence of record there is no way of determining the extent to which the purported *289 debts representing the dollar total of $76,382.35 did or did not constitute existing and unpaid bona fide debts. We do know that early in 1961 when the revenue agent was making an examination as to the bad debt deductions claimed on the 1957 return and some, but not all, of the pertinent individual ledger cards were produced, some of the cards which were produced bore entries indicating that the accounts had been paid in full as much as two years previously and that others had been paid in part. And yet, the ledger cards indicating payment in full had not only not been removed and retired from the file or box containing ledger cards on which debit balances were still reflected but bad debt deductions had been claimed in full on the 1957 return for such accounts. Similarly in those instances where the ledger cards indicated payments in part the claimed deductions had covered the accounts in full. As to the collection of the amounts shown as paid by the ledger cards in question, the record is silent. Neither do we know the disposition of any amounts which were or may have been collected. Based on the testimony of the revenue agent to the effect that he was not able to trace any such *290 collections into the record receipts of petitioner, it is the contention of petitioner's counsel that it must be concluded that any such collections were not included in the cash receipts as shown by petitioner's books but were diverted therefrom. On the record as it stands, however, there is no way to determining that any such collections did or did not go into petitioner's cash receipts or were not in fact received for petitioner's account and otherwise applied and used for its benefit, and, in the absence of the individual customer ledger cards, the same may be said as to any or all of the individual accounts which were shown by the ledger cards to have been paid in full or in part during the taxable years herein. Since the cards which were seen by the revenue agent constituted only a portion of the cards covering all the accounts for which bad debt deductions had been claimed for 1957, we have no way of knowing whether there were not other cards reflecting full or partial payment, which in full amounts are reflected in the balances for which the deduction herein is claimed. In so far as shown, Greene would appear to have been in the best position to know just what did happen. *291 Presumably he was still employed by petitioner when Dale, the independent accountant employed by petitioner at the time the revenue agent was making his examination, raised the question of irregularities, the exact nature of which is not shown. Further it is to be noted that at the trial herein there was resistance on the part of the Stewarts to the suggestion or intimation that Greene had made any appropriations of funds to his own uses or was guilty of any wrongdoing. In any event, whatever the facts, they made it clear that when Greene left his employment with petitioner it was of his own volition and not because he was fired from his job. Petitioner's counsel has displayed a similar reluctance to regard Greene as guilty of diverting or appropriating collections on customer accounts to his own uses and, as to the nature of the irregularities referred to above, on brief states that if "suspicions" are to be indulged in "it is a far more 196 likely explanation that some of these ledger cards showed substantial amounts due from Greene or his friends." He offers no suggestion as to the basis for his "suspicions" as to what he regards as "a far more likely explanation." We do not *292 regard it as reasonable to assume, however, that he was not influenced by some circumstances, if not facts, of which he was aware and since his conjecturing does have to do with missing ledger cards it could be that, in addition to such ledger cards as were discovered by the revenue agent, there were also cards of the nature now suggested by counsel which did not reflect bona fide debts of a character to be included in accounts receivable such as are herein question. This brings us to some questions as to certain debits to accounts receivable and the amounts thereof which are not fully answered by the evidence of record. Presumably under petitioner's system of accounting the breakdown or distribution of the debits for posting to the various journals, as for instance car sales, new or used, repairs, payroll and cash disbursements, is made at the time the debits are entered on the customer ledger cards, from which they are posted to the various journals, according to the categories shown on the card forms for such breakdown or distributions. We of course do not have any of the customer ledger cards so as to know what they did show as to the breakdown or distribution of the debits *293 for posting to the appropriate journal or journals and thus inform ourselves as to the nature of the debits which in the various transactions, such as sales or repairs, comprised the total charges for which the individual customer was obligated. Absent the actual ledger cards, it would seem reasonable to conclude that a blank ledger card form might throw some substantial light as to some if not all of the debit categories. Certain it is that the composition or derivation of one or more of the debit categories, as shown in Exhibit 30, is not, to us, patent or obvious. No such card was placed in evidence and we are left to conjecture. As shown by Exhibit 30, cash disbursements is one such category and immediately suggests the question as to how in a selling operation cash disbursements could give rise to debits or charges to customers, particularly in such ratably large amounts, reaching in one year to in excess of 50 percent of total debits and exceeding slightly the total cash receipts for the year, and in a number of other years ranging from 20 percent and up of total debits which include such other categories as new and used car sales and repairs, among others. It was Stewart's *294 testimony that in the case of new cars its sales were for the most part financed by the finance company usually to the extent of two-thirds of the selling price, but on a "full recourse basis" in the event the purchaser fell 90 days behind in his payments and the car had to be repossessed. The finance company would add finance and interest charges to the amount due from the customer under the paper so acquired from petitioner and the resulting total would be payable in equal monthly installments. Under the financing arrangement it was the responsibility of the finance company to collect the monthly payments and do the repossessing of cars in the event the car purchaser should be delinquent for as much as 90 days in his payments. In such case the finance company had several alternatives. It could take the car as its own in satisfaction of the balance owing by the purchaser, in which case the petitioner was not obligated in any way. It could as it often did sell the repossessed car at a sheriff's sale and to the extent the amount received for the car was not sufficient to cover the amount remaining due thereon petitioner would be obligated to make up the deficiency, but Stewart did *295 not know how such transactions were "handled" in its accounts. If, however, the finance company so desired it could, by delivering the repossessed car to petitioner within 90 days after the purchaser became deliquent in his payments, require petitioner to pay over to it the full amount for which the purchaser was still obligated. Here again we are not advised as to how such cash disbursements or the repossessed car were dealt with in petitioner's records of account or to what extent the total cash disbursed, with or without adjustment for the repossessed car, was reflected in the debits to the ledger Accounts Receivable account as shown by Exhibit 30 under the category "Cash Disbursements." Also reflected in the ledger balances comprising the $76,382.35 in issue are the unexplained debit of $16,561.61 and the two similarly unexplained credits of $19.75 and $11,653.75 previously noted. As for bad debt deductions the statute is clear. If the debts are bona fide they are 197 deductible for the year in which the debt or debts became worthless and counsel for petitioner makes no claim that Greene was not fully informed on the matter. By conjecture, not proof, he suggests that *296 being of the opinion that further deductions were not needed in the years herein Greene refrained from claiming deductions for debts which had become worthless in a particular year on petitioner's return for such year but "saved" them so as to make petitioner's financial status appear better. As in other instances Greene's testimony would not leave such matters to conjecture and argument and here again the record is clear that no effort was made to procure Greene's testimony either at the trial of this case or otherwise, by deposition for instance. Counsel apparently sought to fill the void in the evidence occasioned by the absence of Greene with the testimony of Jack Stewart. It was Stewart's testimony that "maybe occasionally" he was consulted as to the collection "of a particular account", but generally that would be left to the accounting staff. On cross-examination he referred to Greene as the head "honcho" for all the enterprises. After the question as to whether petitioner "tended to delay writing off receivables" was ruled out as leading and suggestive, Stewart's answer to an inquiry as to petitioner's policy and the method adopted in writing off receivables was "I suppose *297 our policy would have been, as soon as it was determined that it was absolutely and positively an uncollectible item, I would imagine it would be charged off at that time." It is to be noted that it was not until sometime in 1962, and a year and a half after the close of 1959, that the individual ledger cards disappeared and that they were available for screening for worthlessness at all times during the taxable years herein. In fact, Makemson, whose major duty was the collection, where possible, of accounts six months past due, continued on his job with petitioner until sometime in 1960. He was called as a witness but in the main the testimony asked of him was general and in the nature of the procedures followed in his efforts of collection. He was asked some questions about the list of bad debt deductions claimed on the 1956 return. He was not so questioned with respect to 1957, 1958 or 1959, 1959 being the last full year of his employment by petitioner, nor was he questioned as to the results of his efforts to collect specific debts in any of those years nor as to the debts, if any, he concluded had become worthless in each such year. Neither was he questioned as to his personal *298 knowledge of the Deferred Accounts Receivable account even though it is reasonable to believe that in his work he probably had done some work looking toward the collection of some if not most of the accounts transferred to that account from the Accounts Receivable account. Further it was Makemson's testimony that he had written collection letters to the debtors whose account cards had been referred to him but no inquiry was made of him as to whether he maintained a file of the retained copies of such letters and if so what had become of it. In his supplemental brief counsel for petitioner has called the attention of the Court to Arizona's three year statute of limitations on open accounts and six years on contracts in writing, stating however that "petitioner does not believe that the statute of limitations on these accounts forms a proper basis for computing the year of their deductibility." It was the testimony of the accountant who prepared Exhibit 30 that for the period reviewed he and his staff took the dollar totals in the ledger and traced each posting to the journals, which in the course of his testimony he also testified were not source records or records of original *299 entry, and established that the balances shown at. December 31, 1959, in Accounts Receivable accounts had been arrived at through normal bookkeeping processes and "through this normal bookkeeping process, they represented an asset of the corporation." Continuing his testimony, however, he testified that "To substantiate the fairness of the asset, or its worth, or to make any evaluation of its worth, we would have needed subsidiary accounts to show what customer owed the money or what inner company account was involved. That information was not available to us. We established dollars. We were not able to verify the customers involved." Similarly on the record here we conclude and hold that petitioner has not borne its burden of showing existing and unpaid debts in the amount claimed or that such debts as did exist became worthless in any of the years as claimed. With respect to the alternative claim of a deductible loss in 1957 by reason of abandonment and assuming, but not deciding, 198 that a loss in respect of accounts receivable is allowable for the year of abandonment, if in fact the asset has been abandoned, we find no proof of record of any act which, in our opinion, *300 might be regarded as constituting abandonment of the debts herein in 1957 or any year before us. In light of the fact that quite a number of concessions and adjustments have been agreed to or made by the parties, thereby disposing the issues with respect thereto, a computation of tax will be necessary for each of the years herein. Decision will be entered under Rule 50. Footnotes
1. Meyers died prior to the trial herein. ↩
2. It was Makemson's testimony that he did recognize on the lists names of accounts which he had reported as being bad debts but he gave no testimony as to whether he saw names of any accounts which he did not recognize as bad, or if so whether he called them to the attention of Greene or Meyers.↩
3. The petitioner had employed an accounting firm to do some work in connection with the audit by revenue agent Diller. Carl Dale, assigned by the firm to do the work, had come to Spencer Stewart and suggested that he questioned the honesty of Greene. At or shortly thereafter Greene left his employment with petitioner. Dale suggested the employment of B. Van Voorhis Munson in Greene's place and when Munson came to work for the petitioner on April 1, 1961, he made a search for the customer ledger cards but was not able to find any of them. It was Diller's recollection that it might have been at his first conference with Munson that he learned that all of the ledger cards had disappeared. It was Spencer Stewart's testimony that he found it difficult to believe that Greene was guilty of any wrongdoing.↩
4. The record of the various assets sold by petitioner when it terminated its operations as a Studebaker dealer shows no breakdown of sales as between the various purchasers. There is no showing as to the basis to petitioner for items sold to Seber, or as to the profit, if any, realized by petitioner on the sale. Further there was no showing of a ledger card covering the sale to Seber. If there was such a card, it was not produced for Diller and presumably disappeared with the other cards.↩
5. It was Seber's testimony that the total amount agreed to as the purchase price of the equipment was around $6,000 but that he did not remember the amount exactly and that by about 1958 the full amount owed by him had been paid by the performance of towing contracts for petitioner. Being upset by Greene's notice that he owed "$9,000 to $10,000," he "got hold of Jack and Spencer and Frank, and * * * it was admitted" that he did not owe them that much money and would not have to pay it. Neither of the Stewarts nor Seber in the course of their testimony mentioned seeing a note of Seber's or a ledger card covering the purchases by Seber at the time of the conference with Greene relative to Seber's purchases and payments thereon. There is no showing as to the date of this conference, or as to the towing, if any, that Seber had already done.↩
6. The amount of the above debit and credit had been supplied to Munson by Carl Dale of the independent accounting firm employed by petitioner at the time of or with relation to the examination of petitioner's books and records for 1957 through 1959 by revenue agent Diller. Prior to making the above entries Munson discussed the matter with Dale. Dale was deceased at the time of the trial herein.↩
7. The $130,447.12 so shown as the accumulated net operating loss at December 31, 1956, was disallowed in toto by the respondent in his determinations of deficiency for 1957, 1958 and 1959 and though it was originally an issue herein, that issue has now been conceded by respondent.↩